Exhibit "A"

## MASTER LEASE

This **MASTER LEASE** (this "**Lease**") is made and entered into as of April 21, 2008 (the "**Effective Date**"), by and between **GE CAPITAL FRANCHISE FINANCE CORPORATION**, a Delaware corporation ("**Lessor**"), and **GK MANAGEMENT, INC.**, a Georgia corporation ("**Lessee**").

In consideration of the mutual covenants and agreements contained in this Lease, Lessor and Lessee covenant and agree as follows:

## BASIC LEASE INFORMATION

| | |
|---|---|
| Premises Address: | 2000 Watson Blvd, Warner Robins, GA 31093 |
| | 2617 Deans Bridge Rd, Augusta, GA 30906 |
| Initial Term Expiration Date: | April 30, 2028. |
| Extension Periods: | Up to two periods of five years each, as set forth in **Section 2.3**. |
| Base Annual Rent: | $86,160.00, as adjusted on each Adjustment Date, as provided in **Section 3.2**, and as further described on **Exhibit A**. |
| Adjustment Date: | The first day of the month following the month in which the first anniversary of the Effective Date occurs, and every subsequent annual anniversary of such date during the Lease Term. |
| Adjustment Percentage: | 2.00% |
| Permitted Concept: | The Premises will be used solely as a Long John Silver's restaurant. |
| Discount Rate: | 6% per annum. |
| Franchisor: | Long John Silver's, Inc. a Delaware corporation, and its successors. |
| Guarantors: | James D. Graves and Johnathan E. Kneff. |
| Lessor's Address: | GE Capital Franchise Finance Corporation |
| | 450 South Orange Avenue, Suite 1100 |
| | Orlando, FL 32801-3352 |
| | Attention: Asset Management |
| Lessee's Address: | GK Management, Inc. |
| | 2095 Highway 211 NW, Suite 2F #362 |
| | Braselton, GA 30517 |
| | Attention: James D. Graves and Johnathan E. Kneff |
| | Telephone: 916-208-1062 |

4833-5207-4242.4

| With a Copy to: | Sarah M. Clark, Esq. |
| | Frost Brown Todd LLC |
| | 424 Church Street, Suite 1600 |
| | Nashville, TN 37219-2308 |
| | Telephone: 615-251-5584 |

Right of First Offer:    See **Article 16**.

# ARTICLE 1
# DEFINITIONS

<u>Defined Terms</u>.  The following defined terms have the following meanings:

"*ADA*" means the Americans with Disabilities Act of 1990, as such act may be amended from time to time.

"*Additional Rent*" means all sums of money required to be paid by Lessee under this Lease, other than Base Annual Rent.

"*Affiliate*" means any Person that directly or indirectly controls, is under common control with, or controlled by any other Person.  For purposes of this definition "**controls**", "**under common control with**" and "**controlled by**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including 18 U.S.C. § § 1956 and 1957, and the BSA.

"*Applicable Regulations*" means all applicable statutes, regulations, rules, ordinances, codes, licenses, permits, orders and approvals of each Governmental Authority having jurisdiction over the Premises, including, without limitation, all health, building, fire, safety and other codes, ordinances and requirements, all applicable standards of the National Board of Fire Underwriters and the ADA and all policies or rules of common law, in each case, as amended, and any judicial or administrative interpretation, including any judicial order, consent, decree or judgment applicable to any of the Lessee Parties.

"*Base Monthly Rent*" means an amount equal to 1/12 of the applicable Base Annual Rent.

"*BSA*" means the Bank Secrecy Act (31 U.S.C. § § 5311 et. seq.), and its implementing regulations, Title 31 Part 103 of the U.S. Code of Federal Regulations.

"*Business Day*" means any day on which Lessor is open for business other than a Saturday, Sunday or a legal holiday, ending at 5:00 P.M. Phoenix, Arizona time.

"*Change of Control*" means a change in control of any of the Lessee Parties, including, without limitation, a change in control resulting from direct or indirect transfers of voting stock or partnership, membership or other ownership interests, whether in one or a series of transactions.  For purposes of this definition, "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any of the Lessee Parties, as applicable, and a Change of Control will occur if any of the following occur:  (a) any merger or consolidation by any of the Lessee Parties, as applicable, with or into any other entity; or (b) if any "**Person**" as defined in **Section 3(a)(9)** of the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), and as used in **Section 13(d)** and **14(d)** of the Exchange Act, including a "**group**" as defined in **Section 13(d)** of the Exchange Act, subsequent to the Effective Date, becomes the "**beneficial owner**" (as defined in Rule 13d-3 under the Exchange Act) of securities of any of the Lessee Parties, as applicable, representing 50% or more of the combined voting power of Lessee's then outstanding securities (other than indirectly as a result of the redemption by any of the Lessee Parties, as applicable, of its securities).

"*Code*" means Title 11 of the United States Code, 11 U.S.C. Sec. 101 *et seq.*, as amended.

"*Default Rate*" means the lesser of the highest rate for which Lessee may legally contract or the rate of 14% per annum.

2

"***Environmental Indemnity Agreement***" means the environmental indemnity agreement dated as of the Effective Date executed by Lessee for the benefit of the Indemnified Parties, as the same may be amended from time to time.

"***Franchise Agreement***" means, collectively, the franchise, license or area development agreements with Franchisor for the conduct of business at the Premises as a Permitted Concept, together with all amendments, modifications, supplements and extensions.

"***Governmental Authority***" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority having jurisdiction or supervisory or regulatory authority over the Premises (including past or present activities or conditions at or under any portion of the Premises) or any of the Lessee Parties.

"***Guaranty***" means the unconditional guaranty of payment and performance dated as of the Effective Date executed by Guarantors for the benefit of Lessor with respect to this Lease, as the same may be amended from time to time.

"***Indemnified Parties***" means Lessor, Lender and their respective directors, officers, shareholders, trustees, beneficial owners, partners and members; any directors, officers, shareholders, trustees, beneficial owners, partners, members of any shareholders, beneficial owners, partners or members of Lessor or Lender; and all employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any of the foregoing, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor, or Lender, as applicable.

"***Lease Term***" means the time period commencing on the Effective Date and ending on the Lease Term Expiration Date.

"***Lease Term Expiration Date***" mean the Initial Term Expiration Date unless this Lease has been extended pursuant to **Section 2.3**, in which case the Lease Term Expiration Date is the last day of the applicable extension term; ***provided, however***, that if this Lease is terminated prior to the Initial Term Expiration Date or prior to the end of an applicable extension term, then the Lease Term Expiration Date is the date of such earlier termination.

"***Lender***" means any lender in connection with any loan secured by Lessor's interest in the Premises, and any servicer of any loan secured by Lessor's interest in the Premises.

"***Lessee Parties***" means, collectively, Lessee, Guarantors and all Affiliates of Lessee and Guarantors.

"***Lessor Parties***" means, collectively, Lessor (including any predecessor-in-interest to Lessor) and any Affiliate of Lessor (including any Affiliate of any predecessor-in-interest to Lessor).

"***Loan Documents***" means, collectively, all documents, instruments and agreements executed in connection with any Mortgages, all as amended, modified and supplemented from time to time and any and all replacements or substitutions.

"***Losses***" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, reasonable attorneys' fees, court costs and other costs of defense).

"***Material Adverse Effect***" means a material adverse effect on (a) any material portion of the Premises, including, without limitation, the operation of any material portion of the Premises as a Permitted Concept; or (b) Lessee's performance of its obligations under this Lease.

"***Mortgages***" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Premises, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"***OFAC Laws and Regulations***" means  Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the Cuban Assets Control

4833-5207-4242.4

Regulations (Title 31 Part 515 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or at any time after the Effective Date entered into between, among, by, or for the benefit of, on the one hand, any of the Lessee Parties, and, on the other hand, any of the Lessor Parties, including, without limitation, the Environmental Indemnity Agreement, the Guaranty and the Purchase Agreement, but excluding this Lease.

"*Person*" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personal Property*" means all tangible personal property now or at any time after the Effective Date located on or at the Premises or used in connection with the Premises, including, without limitation, all machinery, appliances, furniture, equipment and inventory; *provided, however*, the term Personal Property shall not include the HVAC, walk-in coolers, walk-in freezers, supply fans, exhaust fans, air ducts, hoods, vents, built-in sinks, built-in countertops, plumbing and electrical fixtures, sign poles and lighting poles, all of which items are intended to be fixtures as such term is used within the definition of Premises.

"*Premises*" means, collectively, the real property described by address, Lessor Number and Unit Number as listed on **Exhibit A** and legally described in **Exhibit A-1**, together with all rights, privileges and appurtenances thereto, and all buildings, fixtures and other improvements now or after the Effective Date located thereon (whether or not affixed to such real property).

"*Purchase Agreement*" means that certain Purchase Agreement dated as of the Effective Date between Lessor and Lessee with respect to the Premises.

"*Rent*" means Base Monthly Rent and Additional Rent for each Premises, as further described on **Exhibit A**.

"*Unmatured Default*" means any event or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

## ARTICLE 2
## LEASE OF PREMISES

2.1     <u>Demise of Premises</u>.  In consideration of the rentals and other sums to be paid by Lessee and of the other terms, covenants and conditions on Lessee's part to be kept and performed, Lessor leases to Lessee, and Lessee takes and hires, the Premises for the Lease Term.  The Premises are leased to Lessee "**AS IS**" and "**WHERE IS**" without representation or warranty by Lessor and subject to the rights of parties in possession, to the existing state of title, any state of facts which an accurate survey or physical inspection might reveal, and all Applicable Regulations now or after the Effective Date in effect.  Lessee has examined the Premises and title to the Premises and has found all of the same satisfactory for all of Lessee's purposes.

2.2     <u>Master Lease Characterization</u>.  (a)  Lessor and Lessee intend that:

(i)        this Lease constitutes a single master lease of all, but not less than all, of the Premises and that Lessor and Lessee have executed and delivered this Lease with the understanding that this Lease constitutes a unitary, insuperable instrument pertaining to all, but not less than all, of the Premises, and that neither this Lease nor the duties, obligations or rights of Lessee may be allocated or otherwise divided among the real property comprising the Premises by Lessee;

(ii)       this Lease is a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and

(iii)       the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between landlord and tenant and has been entered into by both parties in reliance upon the economic and legal bargains contained in this Lease.

(b)       Lessor and Lessee acknowledge and agree that the Lease Term, including any term extensions provided for in this Lease, is less than the remaining economic life of the Premises.

(c)       Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and irrevocably waives any claim or defense that asserts that this Lease is anything other than a true lease. Lessee covenants and agrees that it will not assert that this Lease is anything but a true lease. Lessee stipulates and agrees not to challenge the validity, enforceability or characterization of the lease of the Premises as a true lease and further stipulates and agrees that nothing contained in this Lease creates or is intended to create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like. Lessee shall support the intent of the parties that the lease of the Premises pursuant to this Lease is a true lease and does not create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs.

(d)       Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a master lease of the Premises and irrevocably waives any claim or defense which asserts that this Lease is anything other than a master lease. Lessee covenants and agrees that it will not assert that this Lease is anything but a unitary, insuperable instrument pertaining to the lease of all, but not less than all, of the Premises. Lessee stipulates and agrees not to challenge the validity, enforceability of characterization of the lease of the Premises as a unitary, insuperable instrument pertaining to the lease of all, but not less than all, of the Premises. Lessee shall support the intent of the parties that this Lease is a unitary, insuperable instrument pertaining to the lease of all, but not less than all, of the Premises if, and to the extent that, any challenge occurs.

(e)       Lessee represents and warrants to Lessor that (i) the Base Annual Rent (including Base Annual Rent payable during any Extension Period) is the fair market value for the use of the Premises and was agreed to by Lessor and Lessee on that basis, and (ii) the execution, delivery and performance by Lessee of this Lease does not constitute a transfer of all or any part of the Premises.

(f)       The expressions of intent, the waivers, the representations and warranties, the covenants, the agreements and the stipulations set forth in this Section are a material inducement to Lessor entering into this Lease.

2.3      Option To Extend.

(a)       Extension Period. Lessee shall have the option to continue this Lease for each of the Extension Periods; *provided, however*, that Lessee shall not be entitled to exercise any extension option if, at the time of exercise or at the time the extension term would commence, an Unmatured Default or Event of Default shall have occurred and be continuing.

(b)       Exercise of Option. Lessee shall exercise such extension option by giving written notice to Lessor of Lessee's intention to do so not more than 270 days or less than 210 days prior to the expiration of the Lease Term then in effect and upon receipt of such notice Lessor shall within 90 days, at Lessee's expense, cause an appraisal of the fair market rental value of the Premises to be made by an independent MAI appraiser. If within 20 days after being notified of the result of such appraisal, Lessee elects to reject that appraisal, then Lessor shall deliver to Lessee a list of not less than three independent MAI appraisers who are experienced with appraising property similar to the Premises, and Lessee shall select one such appraiser. Within 60 days of such selection an appraisal shall be made of the Premises by that appraiser and within 20 days after the results of that appraisal shall have been delivered to Lessee, Lessee shall notify Lessor of Lessee's election to exercise its option to extend this Lease and shall pay the rental so established by that appraisal which shall be absolutely net to Lessor as provided in **Section 3.3**. All appraisals pursuant to this Section shall take into account the customary market conditions then in effect for the lease of comparable properties for a period of time equal to the extension term, including, to the extent applicable, CPI adjustments or fixed bump increases.

(c)       Failure to Give Notice. If Lessee fails to give written notice of exercise of an extension option within the applicable time periods set forth above, then this Lease shall terminate on the last day of the Lease Term as in effect prior to the time during which Lessee could have exercised the option to extend for the particular Extension Period at issue.

4833-5207-4242.4

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

(d)     Terms of Extension.  If Lessee properly extends this Lease for an Extension Period, such extension shall be on all of the same terms and conditions as then in effect, except that Base Annual Rent for the Extension Period shall be determined as provided in **Section 2.3(e)**.

(e)     Base Annual Rent.  During the applicable Extension Period, the Base Annual Rent shall be equal to the then annual fair market rental value of the Premises at the commencement of such Extension Period as determined pursuant to **Section 2.3(b)**, subject to increases on each Adjustment Date thereafter as described in **Section 3.2**.

2.4     Quiet Enjoyment.  Conditioned upon Lessee paying the Base Annual Rent and all Additional Rent and performing and fulfilling all of the covenants, agreements, conditions, and provisions in this Lease to be kept, observed or performed by Lessee, Lessee may at all times during the Lease Term peaceably, quietly, and exclusively have, hold, and enjoy the Premises, subject to the terms and conditions of this Lease.  Notwithstanding the foregoing, however, in no event shall Lessee be entitled to bring any action against Lessor to enforce its rights under this Lease if an Unmatured Default or Event of Default shall have occurred and be continuing.

2.5     Holding Over.  If Lessee remains in possession of any portion of the Premises after the expiration of the Lease Term, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay rentals and other sums in the amounts provided in this Lease, except that the Base Monthly Rent shall be automatically doubled, and to comply with all the terms of this Lease; provided that nothing in this Lease nor the acceptance of rent by Lessor shall be deemed a consent to such holding over.  Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless for, from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term, including, without limitation, any claims made by any succeeding lessee.  Lessee hereby agrees that in the event of any such holding over, and notwithstanding the Lessor's acceptance of rent or any other apparent acquiescence on the part of the Lessor, Lessee shall remain a tenant at sufferance and shall not be deemed a tenant at will, Lessee hereby waiving any right it may have under O.C.G.A. Section 44-7-7 to prior notice from Lessor in order to terminate such tenancy.

2.6     Removal of Lessee's Property.  At the expiration of the Lease Term and provided that no Unmatured Default or Event of Default has occurred and is continuing, Lessee may remove from the Premises all personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal and shall leave the Premises broom clean and in good and working condition and repair inside and out.

2.7     Lessee's Property Left on the Premises.  If any personal property (including trade fixtures) of Lessee is left on the Premises following the Lease Term Expiration Date, Lessor may treat such property as abandoned by Lessee.  In addition to any other rights and remedies available to Lessor, Lessor, at Lessor's option and without any further notice to Lessee, may either sell any such property and retain all of the proceeds of sale without any accounting to Lessee or Lessor may store such property, on or off of the Premises, in Lessee's name and at Lessee's expense.  Lessee agrees to pay such amounts to Lessor within ten (10) days of receipt of an invoice from Lessor.

2.8     Delivery of Certain Documents to Lessor.  On or prior to the end of the Lease Term, Lessee will deliver to Lessor, for Lessor's use at no cost to Lessor, copies of all engineering, environmental, architectural and site plans, inspection reports, tests, feasibility reports, and other documents relating to the Premises and prepared for or on behalf of Lessee and which are non-confidential to Lessee, as reasonably determined by Lessee.

## ARTICLE 3
## RENT

3.1     Rental Payments.  On or before the first day of each calendar month during the Lease Term, Lessee shall pay Lessor in advance the Base Monthly Rent then in effect without any setoff, abatement, deferment, deduction or counterclaim whatsoever.  If the Effective Date is a date other than the first day of the month, Lessee shall pay Lessor on the Effective Date the Base Monthly Rent prorated on the basis of the ratio that the number of days from the Effective Date through the last day in the month containing the Effective Date bears to the number of days in such month.

3.2     Adjustments.  Commencing on the first Adjustment Date and on each Adjustment Date after the first Adjustment Date, the Base Annual Rent shall increase by an amount equal to the product of the then current Base Annual Rent and the Adjustment Percentage.  The increased Base Annual Rent shall constitute the Base Annual Rent due and payable until the next Adjustment Date.

6

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

3.3     Rentals to Be Net to Lessor. This Lease is a net lease and, notwithstanding any present or future law to the contrary, this Lease shall not terminate except as otherwise expressly provided in this Lease, nor shall Lessee be entitled to any abatement, reduction, diminution, set-off, counterclaim, defense or deduction with respect to any Base Annual Rent, Additional Rent or other sums payable under this Lease, nor shall the obligations of Lessee under this Lease be modified, waived, or otherwise affected, by reason of: (a) any damage to or destruction of the Premises or any portion of the Premises; (b) any defect in the condition, design, operation or fitness for use of the Premises or any portion of the Premises; (c) any partial or temporary taking of the Premises or any part of the Premises by condemnation or otherwise; (d) any prohibition, limitation, interruption, cessation, restriction or prevention of Lessee's use, occupancy or enjoyment of any portion of the Premises, or any interference with such use, occupancy or enjoyment by any person; (e) any eviction by paramount title or otherwise; (f) any default by Lessor under this Lease or under any other agreement; (g) the impossibility or illegality of performance by Lessor, Lessee or both; (h) any action of any Governmental Authority; (i) construction on or renovation of any portion of the Premises; (j) any failure of the Premises to comply with Applicable Regulations; or (k) any other cause whether similar or dissimilar to the foregoing. All costs, expenses and obligations of every kind and nature whatsoever relating to the Premises and the appurtenances to the Premises and the use and occupancy of the Premises which may arise or become due and payable with respect to the period which ends on the Lease Term Expiration Date (whether or not the same shall become payable during the Lease Term or after the Lease Term Expiration Date shall be paid by Lessee except as otherwise expressly provided in this Lease. It is the purpose and intention of Lessor and Lessee that the Base Annual Rent and the Additional Rent due under this Lease shall be absolutely net to Lessor and that this Lease shall yield, net to Lessor, the Base Annual Rent and the Additional Rent provided in this Lease. The parties intend that the obligations of Lessee under this Lease shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated pursuant to an express provision of this Lease. Lessee shall remain obligated under this Lease in accordance with its terms and shall not take any action to terminate, rescind or avoid this Lease, notwithstanding any bankruptcy, insolvency, reorganization, liquidation, dissolution or other proceeding affecting Lessor or any action with respect to this Lease which may be taken by any trustee, receiver or liquidator or by any court. Except as otherwise expressly provided in this Lease, Lessee waives all rights to terminate or surrender this Lease, or to any abatement or deferment of Base Annual Rent, Additional Rent or other sums payable under this Lease.

3.4     Payments by Automated Clearing House Debit. Upon execution of this Lease, Lessee shall authorize Lessor to establish arrangements pursuant to which payments of the Base Monthly Rent and impound payments, if any, are transferred by Automated Clearing House Debit initiated by Lessor or its designee directly from an account at a U.S. bank in the name of Lessee to such account as Lessor may designate or as Lessor may otherwise designate; *provided, however*, upon notice from Lender to Lessee and Lessor delivered in the manner set forth in **Section 15.3**, Lessee shall deliver all payments of Base Monthly Rent as specified in such notice from Lender.

3.5     Late Charges; Default Interest. Any delinquent payment (that is, any payment not made within five calendar days after the date when due) of Rent shall, in addition to any other remedy of Lessor, incur a late charge of 5% (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment, the exact of amount of which cost would be impractical to ascertain, and such late charge should not be considered as a penalty or as interest, the parties hereby agreeing that such late charge is a reasonable estimate of such handling and processing costs) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

3.6     Additional Rent. Lessor shall have the same remedies for nonpayment of Additional Rent as those provided in this Lease for the nonpayment of Base Annual Rent.

3.7     Guaranty. Concurrently with the execution of this Lease, Lessee shall provide to Lessor a Guaranty, in form and substance satisfactory to Lessor, signed and acknowledged by each of the Guarantors, whereby each of the Guarantors guarantees payment and performance of all of the obligations of Lessee under this Lease.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF LESSEE

4.1     Representations and Warranties of Lessee. The representations and warranties of Lessee contained in this Section are being made to induce Lessor to enter into this Lease and Lessor has relied, and will continue to rely, upon such representations and warranties. Lessee represents and warrants to Lessor as of the Effective Date as follows:

(a)     Organization, Authority and Status. Each of the Lessee Parties (other than individuals) is duly organized or formed, validly existing and in good standing under the laws of its state of incorporation or formation. Lessee is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in

7

4833-5207-4242.4

the state where the Premises are located, and each of the Lessee Parties is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in any other jurisdiction where the failure to be qualified would reasonably be expected to result in a Material Adverse Effect. All necessary action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and by each of the Lessee Parties of the Other Agreements being executed by each Lease Party concurrently with the execution of this Lease. Lessee is not a "**foreign corporation**", "**foreign partnership**", "**foreign trust**", "**foreign limited liability company**" or "**foreign estate**", as those terms are defined in the Internal Revenue Code and the regulations promulgated pursuant to the Internal Revenue Code. The person(s) who have executed this Lease on behalf of Lessee are duly authorized to do so. None of the Lessee Parties, and no individual or entity owning directly or indirectly any interest in any of the Lessee Parties, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations.

(b)     Enforceability. Upon execution by Lessee, this Lease shall constitute the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity.

(c)     Litigation. There are no suits, actions, proceedings or investigations pending, or, to the best of its knowledge, threatened against or involving any of the Lessee Parties or any portion of the Premises before any arbitrator or Governmental Authority, except for such suits, actions, proceedings or investigations which, individually or in the aggregate, have not had, and would not reasonably be expected to result in, a Material Adverse Effect.

(d)     Absence of Breaches or Defaults. The Lessee Parties are not, and the authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for in this Lease will not result in, any breach or default under any document, instrument or agreement to which any of the Lessee Parties is a party or by which any of the Lessee Parties, any portion of the Premises or any of the property of any of the Lessee Parties is subject or bound, except for such breaches or defaults which, individually or in the aggregate, have not had, and would not reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for in this Lease will not violate any applicable law, statute, regulation, rule, ordinance, code, rule or order. Lessee has not assigned, transferred, mortgaged, hypothecated or otherwise encumbered this Lease or any rights or interest in this Lease.

(e)     Financial Information. Lessee has delivered to Lessor certain financial statements and other information concerning the Lessee Parties in connection with this Lease (collectively, the "**Financial Information**"). The Financial Information is true, correct and complete in all material respects; there have been no amendments to the Financial Information since the date such Financial Information was prepared or delivered to Lessor. Lessee understands that Lessor is relying upon the Financial Information and Lessee represents that such reliance is reasonable. All financial statements included in the Financial Information were prepared in accordance with consistently applied accounting principles, and fairly present as of the date of such financial statements the financial condition of each individual or entity to which they pertain. No change has occurred with respect to the financial condition of any of the Lessee Parties or the Premises as reflected in the Financial Information that has not been disclosed in writing to Lessor or has had, or could reasonably be expected to result in, a Material Adverse Effect.

(f)     Solvency. Both before and immediately after the consummation of the transactions contemplated by this Lease and after giving effect to such transactions, (i) the fair value of the assets of Lessee, at a fair valuation, will exceed the debts and liabilities, subordinated, contingent or otherwise, of Lessee; (ii) the present fair saleable value of the assets of Lessee will be greater than the amount that will be required to pay the probable liability of Lessee on its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) Lessee will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) Lessee will not have unreasonably small amount of capital with which to conduct the business in which it is engaged as such business is now conducted and as proposed to be conducted after the Effective Date. Lessee does not intend to and does not believe that it will incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its debts and other liabilities, subordinated, contingent, or otherwise.

(g)     No Reliance by Lessee. Lessee specifically acknowledges that neither Lessor nor any agent, officer, employee or representative of Lessor has made any representation or warranty regarding the projected profitability of the business to be conducted on the Premises and that Lessor did not prepare or assist in the preparation

4833-5207-4242.4

of any of the projected figures used by Lessee in analyzing the economic viability and feasibility of the business to be conducted by Lessee at the Premises. Lessee specifically acknowledges that neither Lessor nor any agent, officer, employee or representative of Lessor has made any representation or warranty regarding the treatment of this Lease for accounting purposes.

## ARTICLE 5
## TAXES AND ASSESSMENTS; INSURANCE

5.1     Taxes and Assessments.

(a)     Nature of Taxes and Assessments to be Paid. Lessee shall pay, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against, imposed upon or arising with respect to Lessor, the Premises, this Lease, the rental or other payments due under this Lease or Lessee during the Lease Term which affect in any manner the net return realized by Lessor under this Lease, including, without limitation, the following:

(i)     All taxes and assessments upon the Premises or any part of the Premises and upon any Personal Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments;

(ii)     All taxes, charges, license fees and or similar fees imposed by reason of the use of the Premises by Lessee; and

(iii)     All excise, transaction, privilege, license, sales, use and other taxes upon the rental or other payments due under this Lease, the leasehold estate of either party or the activities of either party pursuant to this Lease.

(b)     Excluded Taxes. Notwithstanding the foregoing, but without limiting the preceding obligation of Lessee to pay all taxes which are imposed on the Rent due under this Lease, in no event will Lessee be required to pay any net income taxes (i.e., taxes which are determined taking into account deductions for depreciation, interest, taxes and ordinary and necessary business expenses) or franchise taxes (unless imposed in lieu of other taxes that would otherwise be the obligation of Lessee under this Lease, including, without limitation, any "**gross receipts tax**" or any similar tax based upon gross income or receipts of Lessor which does not take into account deductions from depreciation, interest, taxes or ordinary or necessary business expenses) of Lessor, or any tax imposed with respect to the sale, exchange or other disposition by Lessor, in whole or in part, of the Premises or Lessor's interest in this Lease (other than transfer or recordation taxes imposed in connection with the transfer of the Premises to Lessee or the termination of this Lease pursuant to the provisions of this Lease).

(c)     Notices; Tax Contests. All taxing authorities shall be instructed to send all tax and assessment invoices to Lessee and Lessee shall promptly provide Lessor and any Lender with copies of all tax and assessment invoices received by Lessee. Upon request, Lessee shall also provide Lessor and any Lender with evidence that such invoices were paid in a timely fashion. Lessee may, at its own expense, contest or cause to be contested, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any taxes or assessments specified in this Section or lien imposed in connection with such taxes or assessments, provided that (i) Lessee shall provide written notice to Lessor of any contest involving more than $25,000.00, (ii) such proceeding shall suspend the collection from the Premises or any interest in the Premises, (iii) no portion of the Premises nor any interest in the Premises would be in any danger of being sold, forfeited or lost by reason of such proceedings, (iv) no Event of Default has occurred and is continuing, (v) Lessee shall have deposited with Lessor adequate reserves for the payment of such taxes or assessments, together with all interest and penalties on such taxes or assessments, unless paid in full under protest, or Lessee shall have furnished the security as may be required in the proceeding or as may be required by Lessor to insure payment of any contested taxes, and (vi) any such contest would not cause any material adverse effect to Lessor.

5.2     Insurance.

(a)     Types and Amounts. Throughout the Lease Term, Lessee shall maintain with respect to the Premises, at its sole expense, the following types and amounts of insurance (which may be included under a blanket insurance policy if

9

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

all the other terms of this Section are satisfied), in addition to such other insurance as Lessor may reasonably require from time to time:

       (i)      Insurance against loss, damage or destruction by fire and other casualty, including theft, vandalism and malicious mischief, flood (if any portion of the Premises is in a location designated by the Federal Emergency Management Administration as a Special Flood Hazard Area), earthquake (if any portion of the Premises is in an area subject to destructive earthquakes within recorded history), boiler explosion (if there is any boiler upon any portion of the Premises), plate glass breakage, sprinkler damage (if any portion of the Premises has a sprinkler system), all matters covered by a standard extended coverage endorsement, all matters covered by a special coverage endorsement commonly known as an "**all risk**" endorsement, and such other risks as Lessor may reasonably require, insuring the Premises for not less than 100% of their full insurable replacement cost.

       (ii)      Commercial general liability insurance, including a products liability clause, insuring Lessor and Lessee against bodily injury liability, property damage liability and automobile bodily injury and property damage liability, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of the Premises or adjoining ways, streets or sidewalks and, if applicable, insurance covering Lessor and Lessee against liability arising from the sale of liquor, beer or wine on the Premises.  Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under **Section 7.1** to the extent insurable, and a "**severability of interest**" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $2,000,000.00 per injury and occurrence with respect to any insured liability, whether for personal injury or property damage, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance reasonably satisfactory to Lessor.

       (iii)      Business income insurance equal to 100% of the Base Annual Rent for a period of not less than twelve months.

       (iv)      To the extent required by Applicable Regulations, state worker's compensation insurance in the statutorily mandated limit, and employer's liability insurance with limits not less than $500,000 or such greater amount as Lessor may from time to time reasonably require and such other insurance as may be necessary to comply with applicable laws.

(b)      <u>Policy Provisions</u>.  All insurance policies shall:

       (i)      Provide for a waiver of subrogation by the insurer as to claims against Lessor, Lender and their respective employees and agents and provide that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, employees, agents, contractors, or subtenants, even if negligent.

       (ii)      Provide that any "**no other insurance**" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor or Lender and that the insurance policy shall not be brought into contribution with insurance maintained by Lessor or Lender;

       (iii)      Contain a standard without contribution mortgage clause endorsement in favor of Lender and its successors and assigns as their interests may appear and any other party designated by Lessor;

       (iv)      Provide that the policy of insurance shall not be terminated, cancelled or substantially modified without at least 30 days' prior written notice to Lessor, Lender and to any other party covered by any standard mortgage clause endorsement;

       (v)      Provide that the insurer shall not have the option to restore the applicable portion of the Premises if Lessor or Lessee elects to terminate this Lease in accordance with the terms of this Lease; and

       (vi)      Be issued by insurance companies licensed to do business in the state in which the Premises is located and which are rated A:VIII or better by Best's Key Rating or are otherwise approved by Lessor.

4833-5207-4242.4

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

5.3     Lessee Obligations.  It is expressly understood and agreed that the foregoing minimum limits of insurance coverage shall not limit the liability of Lessee for its acts or omissions as provided in this Lease.  All liability insurance policies (with the exception of worker's compensation insurance to the extent not available under statutory law), shall designate Lessor and Lender and their respective successors and assigns as additional insureds as their interests may appear and shall be payable as set forth in **Article 8**.  All such policies shall be written as primary policies, with deductibles not to exceed $10,000.00.  Any other policies, including any policy now or after the Effective Date, carried by Lessor or Lender, shall serve as excess coverage. Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and Lender certificates of insurance or, upon the request of Lessor or Lender, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times.  In the event of any transfer by Lessor of Lessor's interest in the Premises or any financing or refinancing of Lessor's interest in the Premises, Lessee shall, upon not less than 10 days' prior written notice, deliver to Lessor or any Lender providing such financing or refinancing, as the case may be, certificates of all insurance required to be maintained by Lessee under this Lease naming such transferee or such Lender, as the case may be, as an additional named insured to the extent required in this Lease effective as of the date of such transfer, financing or refinancing.

5.4     Tax and Insurance Impound.  If an Event of Default shall have occurred because of Lessee's failure to make any payment of Base Monthly Rent or Additional Rent required under this Lease, Lessor may thereafter require Lessee to pay to Lessor sums which will provide an impound account (which shall not be deemed a trust fund) for paying up to the next one year of taxes, assessments or insurance premiums for the Premises.  Upon such requirement, Lessor will estimate the amounts needed for such purposes and will notify Lessee to pay the same to Lessor in equal monthly installments, as nearly as practicable, in addition to all other sums due under this Lease.  Should additional funds be required at any time, Lessee shall pay the same to Lessor on demand. Lessee shall advise Lessor of all taxes and insurance bills that are due and shall cooperate fully with Lessor in assuring that the same are paid.  Lessor may deposit all impounded funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor.  Upon the occurrence of an Event of Default after the creation of the impound account, Lessor may apply all impounded funds against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

## ARTICLE 6
## USE OF THE PREMISES; ALTERATIONS AND IMPROVEMENTS

6.1     Use.

(a)     Permitted Use.  The Premises shall be used solely for the operation of a Permitted Concept.  Except as set forth below, and except during periods when any material portion of the Premises is untenantable by reason of fire or other casualty or condemnation (***provided, however***, during all such periods while such portion of the Premises is untenantable, Lessee shall strictly comply with the other terms and conditions of this Lease), Lessee shall at all times during the Lease Term occupy the Premises and shall diligently operate its business on the Premises. Lessee may cease diligent operation of business at any restaurant operated at the Premises for a period not to exceed 90 days per restaurant and may do so only once within any five-year period per restaurant during the Lease Term.  If Lessee does discontinue operation as permitted by this Section, Lessee shall (i) give written notice to Lessor within 10 days after Lessee elects to cease operation, (ii) provide adequate protection and maintenance of the Premises during any period of vacancy, (iii) comply with all Applicable Regulations and otherwise comply with the terms and conditions of this Lease other than the continuous use covenant set forth in this Section, and (iv) pay all costs necessary to restore such portion of the Premises to its condition on the day operation of the business ceased at such time as such portion of the Premises is reopened for Lessee's business operations or other substituted use approved by Lessor as contemplated below.

(b)     Conversion to Alternative Use.  Lessee shall not, by itself or through any assignment, sublease or other type of transfer, convert the Premises to an alternative use during the Lease Term without Lessor's consent, which consent shall not be unreasonably withheld or delayed.  Lessor may consider any or all of the following in determining whether to grant its consent, without being deemed to be unreasonable: (i) whether the rental paid to Lessor would be equal to or greater than the anticipated rental assuming continued existing use, (ii) whether the proposed rental to be paid to Lessor is reasonable considering the converted use of the Premises and the customary rental prevailing in the community for such use, (iii) whether the converted use will be consistent with the highest and best use of the Premises, and (iv) whether the converted use will increase Lessor's risks or decrease the value of the Premises.

11

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

6.2     Compliance With Laws, Restrictions, Covenants and Encumbrances.

(a)     Use and Occupation.  Lessee's use and occupation of the Premises, and the condition of the Premises, shall, at Lessee's sole cost and expense, comply in all material respects with all Applicable Regulations now or after the Effective Date in effect and all restrictions, covenants and encumbrances of record with respect to the Premises.  In addition, the Lessee Parties shall comply in all material respects with all Applicable Regulations now or after the Effective Date in effect, including, without limitation, the OFAC Laws and Regulations and Anti-Money Laundering Laws.  Without limiting the generality of the other provisions of this Section, Lessee shall comply in all material respects with the ADA, and all regulations promulgated under the ADA, as it affects the Premises.  Lessee will not permit any act or condition to exist on or about the Premises that will increase any insurance rate applicable to the Premises, except when such acts are required in the normal course of its business, and Lessee shall pay for such increase.

(b)     Licenses and Permits.  Lessee shall maintain in full force and effect all licenses and permits, both governmental and private, required to use and operate the Premises as a Permitted Concept.

6.3.    Condition of Premises; Maintenance.  Lessee shall (a) maintain the Premises in good condition and repair, subject to reasonable and ordinary wear and tear, free from actual or constructive waste, (b) operate, remodel, update and modernize the Premises in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Concept, with such remodeling and modernizing being undertaken in accordance with system-wide timing schedules for such activities, and (c) pay all operating costs of the Premises in the ordinary course of business.  Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Premises or make repairs at the expense of Lessor pursuant to any Applicable Regulations at any time in effect.  Lessee expressly waives any rights and defenses that may arise under O.C.G.A. Section 44-7-13, as Lessee has accepted the burden and obligation of maintaining and repairing the entirety of the Premises.

6.4     Alterations and Improvements.  Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Premises in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Premises costing less than $100,000 without Lessor's consent.  For purposes of this Lease, alterations to the exterior, structural, plumbing or electrical elements of the Premises shall mean:

(a)     Alterations that affect the foundation or "**footprint**" of any improvements at the Premises;

(b)     Alterations which involve the structural elements of any improvements at the Premises, such as a load-bearing wall, structural beams, columns, supports or roof;

(c)     Alterations which materially affect any of the building systems, including, without limitation, the electrical systems, plumbing, HVAC and fire and safety systems;

Any work at any time commenced by Lessee on the Premises shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease.  All alterations, additions and repairs to the Premises, including any items attached or affixed to the Premises that are not readily removable, shall be made only in compliance with all Applicable Regulations, including Internal Revenue Service guidelines, shall be free and clear of all liens and shall automatically be deemed a part of the Premises and belong to Lessor.  Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such alterations, additions, repairs and items.  No such alterations, additions, repairs or items shall cause the Premises to have diminished current value, residual value, utility or remaining economic useful life by more than a *de minimis* amount or cause the Premises to become "limited use property" within the meaning of Revenue Procedure 2001-28.

If Lessor's consent is required to the making of any alterations and such consent is given, such alterations shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Upon completion of any alterations for which Lessor's consent is required under this Lease, Lessee shall promptly provide Lessor with (i) evidence of full payment to all laborers and materialmen contributing to the alterations, (ii) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications, (iii) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy), and (iv) any other documents or information reasonably requested by Lessor.

6.5     Liens.  Lessee agrees to keep the Premises free from any liens arising out of any work performed on any portion of the Premises or materials furnished to the Premises.  Lessor may, at any time and in accordance with applicable law,

4833-5207-4242.4

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

post notices of non-responsibility on the Premises and record verified copies of those notices in connection with all work of any kind upon the Premises. Lessor reserves the right to require Lessee to provide lien waivers executed by any contractor or subcontractor who performs work at the Premises, immediately upon such contractor or subcontractor's receipt of payment for completed work.

      6.6    <u>Easements</u>. During the Lease Term, Lessor shall have the right to grant utility easements on, over, under and above the Premises without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Premises in accordance with the provisions of this Lease.

      6.7    <u>Utilities</u>. Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Premises during the Lease Term. Under no circumstances shall Lessor be responsible for any interruption of any utility service.

### ARTICLE 7
### INDEMNIFICATION

      7.1    <u>General Indemnity</u>. Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties for, from and against any and all Losses (excluding Losses suffered by an Indemnified Party arising out of the gross negligence or willful misconduct of such Indemnified Party; **provided, however**, that the term "**gross negligence**" shall not include gross negligence imputed as a matter of law to any of the Indemnified Parties solely by reason of the Lessor's interest in the Premises or Lessor's failure to act in respect of matters which are or were the obligation of Lessee under this Lease) caused by, incurred or resulting from Lessee's operations of or relating in any manner to the Premises, whether relating to their original design or construction, latent defects, alteration, maintenance, use by Lessee or any other person, or otherwise, or from any breach of, default under, or failure to perform, any term or provision of this Lease by Lessee, its officers, employees, agents or other persons, or to which any Indemnified Party is subject because of Lessor's interest in the Premises, including, without limitation, Losses arising from (a) any accident, injury to or death of any person or loss of or damage to property occurring in, on or about the Premises or portion or on the adjoining sidewalks, curbs, parking areas, streets or ways, (b) any use, non-use or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, the Premises or any portion of the Premises or on the adjoining sidewalks, curbs, parking areas, streets or ways, (c) any representation or warranty made in this Lease by Lessee, in any certificate delivered in connection with this Lease or in any other agreement to which Lessee is a party or pursuant to such other agreement being false or misleading in any material respect as of the date of such representation or warranty was made, (d) performance of any labor or services or the furnishing of any materials or other property in respect to the Premises or any portion of the Premises, (e) any taxes, assessments or other charges which Lessee is required to pay under **Article 5**, (f) any lien, encumbrance or claim arising on or against the Premises or any portion of the Premises under any Applicable Regulation or otherwise which Lessee is obligated under this Lease to remove and discharge, or the failure to comply with any Applicable Regulation, (g) the claims of any invitees, patrons, licensees or subtenants of all or any portion of the Premises or any Person acting through or under Lessee or otherwise acting under or as a consequence of this Lease or any sublease, (h) any act or omission of Lessee or its agents, contractors, licensees, subtenants or invitees, (i) any contest referred to in **Section 5.1(c)**, and (j) the sale of liquor, beer or wine on the Premises.

      7.2    <u>Survival</u>. It is expressly understood and agreed that Lessee's obligations under **Section 7.1** or any other indemnification provision of this Lease shall survive the expiration or earlier termination of this Lease for any reason, any other provision of this Lease to the contrary notwithstanding.

### ARTICLE 8
### CASUALTY AND CONDEMNATION

      8.1    <u>Notice of Taking or Casualty</u>. In the event of a taking of all or any part of the Premises for any public or quasi-public purpose by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Lessor, Lessee and those authorized to exercise such right ("**Taking**") or the commencement of any proceedings or negotiations which might result in a Taking, or any material damage to or destruction of the Premises or any part of the Premises (a "**Casualty**"), Lessee will promptly give written notice to Lessor, generally describing the nature and extent of such Taking, proceedings, negotiations or Casualty and including copies of any documents or notices received in connection with such event. Lessee shall promptly send Lessor copies of all other correspondence and pleadings relating to any such Taking, proceedings, negotiations or Casualty. During all periods of time following a Casualty, Lessee shall ensure that the Premises is secure and does not pose any risk of harm to adjoining property owners or occupants or third-parties.

13

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

8.2    Total Taking.  In the event of a Taking of any restaurant located on the Premises, other than for temporary use ("**Total Taking**"), this Lease shall terminate with respect to the portion of the Premises on which such restaurant is located as of the date of the Total Taking except for those provisions in this Lease with respect to such restaurant that expressly survive any such termination, but this Lease shall otherwise continue in full force and effect.  From and after the date of such Total Taking, the Base Annual Rent shall be reduced by an amount equal to the product of (i) the Applicable Rent Reduction Percentage (as defined below) for the portion of the Premises taken, and (ii) the Base Annual Rent in effect immediately before the date of such Total Taking (the "**Adjustment**").  If the date of such Total Taking is other than the first day of a month, the Base Annual Rent payable for the month in which such Total Taking occurs shall be apportioned based on such Adjustment as of the date of the Total Taking.  Lessee's obligations to Lessor under **Section 7.1** with respect to the portion of the Premises subject to such Total Taking and Lessee's obligation to pay all other sums of money under this Lease (whether payable to Lessor or to a third-party) that accrue prior to the date of such Total Taking shall survive the termination of this Lease with respect to the portion of the Premises subject to such Total Taking.  A Total Taking shall include a Taking, other than for a temporary use, of such a substantial part of any portion of the Premises on which a restaurant is located as shall result in the remaining part of that portion of the Premises after such Taking being unsuitable for use as a Permitted Concept, as determined by Lessee in the exercise of good faith business judgment.  Lessor shall be entitled to receive the entire award or payment in connection with a Total Taking without deduction for any estate vested in Lessee by this Lease.  Lessee expressly assigns to Lessor all of its right, title and interest in and to every such award or payment and agrees that Lessee shall not be entitled to any award or payment for the value of Lessee's leasehold interest in this Lease.  Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of Personal Property, the interruption of its business and moving expenses, but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Total Taking or otherwise reduce the amount recoverable by Lessor for the Total Taking.

8.3    Temporary Taking.  In the event of a Taking of all or any part of the Premises for a temporary use ("**Temporary Taking**"), this Lease shall remain in full force and effect without any reduction of Base Annual Rent, Additional Rent or any other sum payable under this Lease.  Except as provided below and subject to the terms and provisions of the Mortgages, Lessee shall be entitled to the entire award for a Temporary Taking, whether paid by damages, rent or otherwise, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which case the award made for such Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the terms of **Section 6.4**, promptly commence and complete the restoration of the Premises.

8.4    Partial Taking or Casualty.  In the event of a Taking which is not a Total Taking or a Temporary Taking ("**Partial Taking**") or of a Casualty, all awards, compensation or damages shall be paid to Lessor, and Lessor shall have the option to (i) subject to the right of Lessee to elect otherwise as set forth in the following sentence, terminate this Lease by notifying Lessee within 60 days after Lessee gives Lessor notice of such Casualty or that title to the affected portion of the Premises has vested in the taking authority or (ii) continue this Lease in effect, which election may be evidenced by either a notice from Lessor to Lessee or Lessor's failure to notify Lessee that Lessor has elected to terminate this Lease within such 60-day period.  Lessee shall have a period of 60 days after Lessor's notice that it has elected to terminate this Lease during which to elect to continue this Lease.  If Lessee elects to terminate this Lease and Lessee does not elect to continue this Lease or shall fail during such 60-day period to notify Lessor of Lessee's intent to continue this Lease, then this Lease shall terminate as of the last day of the month during which such period expired.  Lessee shall then immediately vacate and surrender the Premises and all obligations of either party under this Lease with respect to the Premises shall cease as of the date of termination; *provided, however,* Lessee's obligations to pay Base Annual Rent, Additional Rent and all other sums (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.  If Lessor elects not to terminate this Lease, or if Lessor elects to terminate this Lease but Lessee elects to continue this Lease, then this Lease shall continue in full force and effect on the following terms:  (i) all Base Annual Rent, Additional Rent and other sums and obligations due under this Lease shall continue unabated, and (ii) Lessee shall promptly commence and diligently prosecute restoration of the Premises to the same condition, as nearly as practicable, as prior to such Partial Taking or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgages, Lessor shall promptly make available in installments as restoration progresses an amount up to but not exceeding the amount of any award, compensation or damages received by Lessor after deducting all costs, fees and expenses incident to the collection of such award, compensation or damages, including all costs and expenses incurred by Lessor and Lender in connection with such Partial Taking or Casualty (the "**Net Restoration Amount**"), upon request of Lessee accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly a part of such costs and that Lessee has complied with the terms of **Section 6.4** in connection with the restoration.  Prior to the disbursement of any portion of the Net Restoration Amount with respect to a Casualty, Lessee shall provide evidence reasonably satisfactory to Lessor of the payment of restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty.  Lessor shall be entitled to keep any portion of the Net Restoration Amount that may be in excess of the cost of restoration, and Lessee shall bear all additional costs, fees and expenses of such restoration in excess of the Net Restoration Amount.  If this Lease is terminated as a result of a Casualty, simultaneously with such termination Lessee shall pay Lessor an amount equal to the insurance deductible applicable to such Casualty.

14

8.5     Adjustment of Losses. Any loss under any property damage insurance required to be maintained by Lessee shall be adjusted by Lessor and Lessee.  Subject to the terms and provisions of the Mortgages, any award relating to a Total Taking or a Partial Taking shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section to the contrary but subject to the terms and provisions of the Mortgages, if at the time of any Taking or Casualty or at any time after any Taking or Casualty an Event of Default shall have occurred and be continuing under this Lease, Lessor is authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for an award on account of such Taking or for insurance proceeds on account of such Casualty and to collect such award or proceeds and apply the same, after deducting all costs, fees and expenses incident to the collection of such award or proceeds, to the curing of such default and any other then existing default under this Lease or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its reasonable discretion shall deem proper.  For purposes of this Article 8, the term "**Applicable Rent Reduction Percentage**" means, with respect to any portion of the Premises subject to a Total Taking, a fraction, the numerator of which shall be the insured amount set forth in the owner's policy of title insurance issued by Title Company to Lessor in connection with the acquisition of such portion by Lessor, and the denominator of which shall be the aggregate insured amount set forth in all of the owner's policies of title insurance issued by Title Company to Lessor in connection with the acquisition of the Premises by Lessor, including the portion of the Premises subject to such Total Taking.

**ARTICLE 9**
**ADDITIONAL COVENANTS OF LESSEE**

9.1     Inspection.  Lessor and its authorized representatives shall have the right upon reasonable prior notice (or at any time without prior notice in the event of an emergency) to enter any part of the Premises at reasonable times in order to inspect the same and make photographic or other evidence concerning Lessee's compliance with the terms of this Lease or in order to show the Premises to prospective purchasers and lenders.  Lessee waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Premises and any other loss occasioned by such entry so long as Lessor shall have used reasonable efforts not to unreasonably interrupt Lessee's normal business operations.

9.2     Books and Records.  Lessee shall keep and maintain at the Premises or Lessee's chief executive office full, complete and appropriate books of account and records of Lessee's business relating to the Premises in accordance with consistently applied accounting principles.  Lessee's books and records shall at all reasonable times be open for inspection by Lessor, Lender and their respective auditors or other authorized representatives.

9.3     OFAC Laws and Regulations.  Lessee shall immediately notify Lessor in writing if any individual or entity owning directly or indirectly any interest in any of the Lessee Parties or any director, officer, member, manager or partner of any of such holders is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws.

9.4     Financial Statements.  Within 45 days after the end of each fiscal quarter and within 120 days after the end of each fiscal year of Lessee, Lessee shall deliver to Lessor and Lender (a) complete financial statements of Lessee including a balance sheet, profit and loss statement, statement of cash flow and all other related schedules for the fiscal period then ended; and (b) income statements for each restaurant operated at the Premises.  All such financial statements shall be prepared in accordance with consistently applied accounting principles from period to period, and shall be certified to be accurate and complete by Lessee (or the Treasurer or other appropriate officer of Lessee).  Lessee understands that Lessor and Lender will rely upon such financial statements and Lessee represents that such reliance is reasonable.  If Lessee's property and business at the Premises is ordinarily consolidated with other business for financial statement purposes, such financial statements shall be prepared on a consolidated basis showing separately the sales, profits and losses, assets and liabilities pertaining to the Premises with the basis for allocation of overhead of other charges being clearly set forth.  The financial statements delivered to Lessor and Lender need not be audited, but Lessee shall deliver to Lessor and Lender copies of any audited financial statements of Lessee that may be prepared, as soon as they are available.  Lessee acknowledges and agrees that Lessor may disclose to any prospective purchaser of the Premises the financial statements of Lessee delivered to Lessor pursuant to this Section.

9.5.     Compliance Certificate.  Within 60 days after the end of each fiscal year of Lessee, at the request of Lessor, Lessee shall deliver a compliance certificate to Lessor in a form to be provided by Lessor in order to establish that Lessee is in compliance in all material respects with all of its obligations, duties and covenants under this Lease.

15

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

9.6. <u>Disclosures Regarding Premises and Lessee Parties</u>. Lessee authorizes Lessor and its employees, officers, agents, representatives and designees to (i) discuss the affairs, finances and accounts of Lessee, the other Lessee Parties or the business operations at the Premises with any prospective purchaser or security interest holder in the Premises, and (ii) obtain from, and disclose to, any such prospective purchaser or security interest holder any information regarding Lessee, the other Lessee Parties or the business operations at the Premises, including, without limitation, financial information about Lessee or the other Lessee Parties or the business operations at the Premises. Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties for, from and against any and all Losses arising as the result of any disclosures of information, financial or otherwise, made by Lessor or Lessor's employees, officers, agents and designees as contemplated by this Section.

9.7 <u>Franchise Agreement</u>.

(a) <u>Representations and Warranties</u>. Lessee represents and warrants to Lessor as follows: (i) Lessee has delivered to Lessor a true, correct and complete copy of the Franchise Agreement; (ii) the Franchise Agreement is the only agreement in effect with Franchisor with respect to the Premises; (iii) the Franchise Agreement is in full force and effect and constitutes the legal, valid and binding obligation of Lessee, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity; (iv) none of the Lessee Parties has assigned, transferred, mortgaged, hypothecated or otherwise encumbered the Franchise Agreement or any rights or any interest in the Franchise Agreement; (v) no notice of default from Franchisor has been received under the Franchise Agreement which has not been cured and no notice of default to Franchisor has been given under the Franchise Agreement which has not been cured; and (vi) no event has occurred and no condition exists which, with the giving of notice or the lapse of time or both, would constitute a default under the Franchise Agreement.

(b) <u>Covenants</u>. Lessee covenants to Lessor throughout the Lease Term as follows: (i) Lessee shall maintain the Franchise Agreement in full force and effect; (ii) no event shall occur nor shall any condition exist which, with the giving of notice or the lapse of time or both, would constitute a breach or default under the Franchise Agreement; (iii) Lessee shall give prompt notice to Lessor of any claim of default by or to Lessee under the Franchise Agreement and shall provide Lessor with a copy of any default notice given or received by Lessee under the Franchise Agreement and any information submitted or referenced in support of such claim of default; and (iv) Lessee shall also give prompt notice to Lessor of the expiration or termination of the Franchise Agreement.

(c) <u>Notices</u>. Lessee consents to Lessor providing information it obtains to Franchisor and to Lessor obtaining from Franchisor information which Franchisor receives relating to Lessee's operation of its business on the Premises.

(d) <u>Event of Default</u>. In addition to the Events of Default set forth elsewhere in this Lease, an Event of Default shall be deemed to have occurred under this Lease if there is a breach or default, after the passage of all applicable notice and cure or grace periods, under the Franchise Agreement or if the Franchise Agreement terminates or expires prior to the end of the Lease Term and a substitute agreement for the terminated or expired agreement is not entered into prior to such expiration or termination, which substitute agreement shall be in form and substance reasonably satisfactory to Lessor and shall expire after the scheduled expiration date of this Lease.

(e) <u>Extension Periods</u>. In addition to any condition precedent set forth in **Section 2.3** with respect to the exercise of the Extension Period options, it shall be a condition precedent to the exercise of such options that the Franchise Agreement is extended for a period of not less than the applicable Extension Period.

(f) <u>Disclosures; Indemnity</u>. Lessee authorizes Lessor and its employees, officers, agents, representatives and designees to: (i) discuss the affairs, finances and accounts of Lessee or the other Lessee Parties with Franchisor and the employees, officers, agents and representatives of Franchisor; and (ii) obtain from, and disclose to, Franchisor any information regarding the status of the Franchise Agreements, Lessee or the other Lessee Parties or the business operations at the Premises, including, without limitation, financial information about Lessee or the other Lessee Parties or the business operations at the Premises. Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties for, from and against any and all Losses arising as the result of any disclosures of information, financial or otherwise, made by (i) Lessor or Lessor's employees, officers, agents and designees to Franchisor as contemplated by this Section or (ii) any employee, officer, agent or representative of Franchisor to Lessor or any of the other Indemnified Parties.

16

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

## ARTICLE 10
## DEFAULT AND REMEDIES

10.1.    <u>Default</u>.  Each of the following shall be an event of default under this Lease (each, an "**Event of Default**"):

(a)    If any representation or warranty of any of the Lessee Parties set forth in this Lease or any of the Other Agreements is false in any material respect when made, or if any of the Lessee Parties renders any statement or account to Lessor that is false in any material respect when made;

(b)    If any Rent is not paid within five days after the date due; ***provided, however***, notwithstanding the occurrence of such an Event of Default, Lessor shall not be entitled to exercise its remedies set forth below unless and until Lessor shall have given Lessee notice of such Event of Default and a period of five days from the delivery of such notice shall have elapsed without such Event of Default being cured;

(c)    If any of the Lessee Parties become insolvent within the meaning of the Code, files or notifies Lessor that it intends to file a petition under the Code, initiates a proceeding under any similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts (collectively, an "**Action**"), becomes the subject of either a petition under the Code or an Action, or is not generally paying its debts as the same become due;

(d)    Subject to the provisions of **Section 6.1(a)**, if Lessee vacates or abandons any portion of the Premises;

(e)    If Lessee fails to maintain insurance in accordance with the requirements of **Section 5.2**;

(f)    If Lessee fails to observe or perform any of the other covenants, conditions, or obligations of this Lease; ***provided, however***, if any such failure does not involve the payment of any monetary sum, is not willful or intentional, does not place any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure after receipt of notice of such failure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default under this Lease, unless otherwise expressly provided in this Lease, unless and until Lessor shall have given Lessee notice of such failure and a period of 30 days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred under this Lease without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such 30-day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such 30-day period, which shall in no event exceed 90 days after receiving notice of such failure from Lessor.  If Lessee shall fail to correct or cure such failure within such 90-day period, an Event of Default shall be deemed to have occurred under this Lease without further notice or demand of any kind being required;

(g)    If there is a breach or default, after the passage of all applicable notice and cure or grace periods, under any of the Other Agreements; or

(h)    If a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect and is not discharged or provision made for such discharge within 60 days from the date of entry of such judgment.

10.2    <u>Remedies</u>.  Upon the occurrence of an Event of Default, with or without notice or demand, except the notice prior to default required under certain circumstances by this Lease or such other notice as may be required by statute and cannot be waived by Lessee (all other notices being waived), Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at law or in equity, including without limitation, dispossessory proceedings, distress proceedings, an action for rent, self-help remedies, the right to seek and obtain injunctive relief or specific performance, and any one or more of the following:

(a)    <u>Termination</u>.  Lessor may terminate this Lease without any right of Lessee to reinstate Lessee's rights by payment of any rentals due under this Lease, including Base Annual Rent and Additional Rent, or other performance of the terms and conditions of this Lease, whereupon Lessee's right to possession of the Premises shall cease (and Lessee shall immediately surrender possession of the Premises to Lessor) and this Lease, except as to Lessee's liability, shall be terminated.  Lessee expressly waives any and all rights of redemption granted by or under present or future law in the event this Lease is terminated or Lessee is evicted or dispossessed by reason of any breach by Lessee of any provisions of this Lease.  Upon any termination of this Lease, Lessor may recover from Lessee the following:

17

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

(i)     The worth at the time of award of all unpaid Rent that had been earned at the time of termination;

(ii)    The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided;

(iii)   The worth at the time of award of the amount by which the unpaid Rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided; and

(iv)    Any other amount reasonably necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform its obligations under this Lease.

The "worth at the time of the award" of the amounts referred to in **subsections (i)** and **(ii)** above will be computed by allowing interest at the rate of Default Rate.  The "worth at the time of the award" of the amount referred to in **subsection (iii)** above will be computed by discounting such amount at the Discount Rate.

Lessee acknowledges and agrees that the payment of accelerated Rent pursuant to this Section shall not constitute a penalty or forfeiture but shall constitute liquidated damages for Lessee's failure to comply with the terms of this Lease, Lessor and Lessee hereby agreeing that Lessor's actual damages in such an event are impractical to ascertain and that the amount set forth above is a reasonable estimate thereof.

(b)     _Re-Enter and Retake Possession_.  Lessor may reenter and take possession of the Premises, any or all Personal Property and, to the extent permissible, all franchises, licenses, area development agreements, permits and other rights or privileges of Lessee pertaining to the use and operation of the Premises and to expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting from such actions, without resort to legal or judicial process, procedure or action.  No such re-entry and retaking of possession shall be construed as an election by Lessor to terminate this Lease as provided in **Section 10.2(a)** unless a notice of such termination is given to Lessee.  No notice from Lessor under this Lease or under a forcible entry and detainer statute or similar law shall constitute an election by Lessor to terminate this Lease unless such notice specifically so states.  If Lessee shall, after the occurrence of an Event of Default, voluntarily give up possession of the Premises to Lessor, deliver to Lessor or its agents the keys to the Premises, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance of the Premises or the keys to the Premises by Lessor or its agents shall not be deemed to constitute a termination of this Lease.  Lessor reserves the right following any reentry or reletting to exercise its right to terminate this Lease by giving Lessee written notice of such termination, in which event this Lease will terminate as specified in said notice.

(c)     _Disposition of Personal Property_.  Lessor may seize all Personal Property, and to dispose of the Personal Property in accordance with the laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting from such actions and without resorting to legal or judicial process, procedure or action.

(d)     _Action for Damages_.  Lessor may bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor.

(e)     _Reletting_.  Lessor may relet the Premises or any part of the Premises for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rent due from Lessee in such order as Lessor, may, in it sole discretion, determine, which other sums include, without limitation, all repossession costs, brokerage commissions, reasonable attorneys' fees and expenses, employee expenses, alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable law, Lessor shall have no obligation to relet the Premises or any part of the Premises and shall in no event be liable for refusal or failure to relet the Premises or any part of the Premises, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.  Lessor reserves the right following any such reentry or reletting to exercise its right to terminate

18

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

this Lease by giving Lessee written notice of such termination, in which event this Lease will terminate as specified in said notice.

(f)     Correcting Lessee's Breach.  Lessor may immediately or at any time after the occurrence of such Event of Default, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all costs and expenses incurred by Lessor in connection with such breach or default.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rent under this Lease and shall be immediately due from Lessee to Lessor.  Any such acts by Lessor in correcting Lessee's breaches or defaults under this Lease shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth in this Lease.

(g)     Set-Off.  Lessor may immediately or at any time after the occurrence of such Event of Default, and with or without notice, except as required in this Lease, set off any money of Lessee held by Lessor under this Lease against any sum owing by any of the Lessee Parties.

10.3     Lessee Waiver; No Custom; Cumulative Powers and Remedies.  Lessee expressly waives any right of defense that Lessee may have based on any purported merger of any cause of action, and neither the commencement of any action or proceeding nor the settlement or entering of judgment with respect to any action or proceeding shall bar Lessor from bringing subsequent actions or proceedings from time to time.  Any law, usage or custom to the contrary notwithstanding, Lessor shall have the right at all times to enforce all terms, conditions and covenants of this Lease in strict accordance with this Lease, notwithstanding any conduct or custom on the part of Lessor in refraining from so doing at any time or times.  Further, the failure of Lessor at any time or times to enforce its rights under this Lease strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to any specific term, condition or covenant of this Lease, or as having in any way or manner modified the same.  All powers and remedies given by this **Article 10** to Lessor, subject to applicable law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease or the Other Agreements, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies with respect to any Event of Default.  Every power and remedy given by this Section or by law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

10.4     Lessor's Liability.  Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Lessor, that (a) there shall be absolutely no personal liability on the part of Lessor, its successors or assigns and the trustees, members, partners, shareholders, officers, directors, employees and agents of Lessor and its successors or assigns, to Lessee with respect to any of the terms, covenants and conditions of this Lease, (b) Lessee waives all claims, demands and causes of action against the trustees, members, partners, shareholders, officers, directors, employees and agents of Lessor and its successors or assigns in the event of any breach by Lessor of any of the terms, covenants and conditions of this Lease to be performed by Lessor, and (c) Lessee shall look solely to the Premises for the satisfaction of each and every remedy of Lessee in the event of any breach by Lessor of any of the terms, covenants and conditions of this Lease to be performed by Lessor, or any other matter in connection with this Lease or the Premises, such exculpation of liability to be absolute and without any exception whatsoever.

10.5     Bankruptcy Provisions.

(a)     Lessor's Reliance.  As a material inducement to Lessor executing this Lease, Lessee acknowledges and agrees that Lessor is relying upon (i) the financial condition and specific operating experience of Lessee and Lessee's obligation to use the Premises specifically in accordance with system-wide requirements imposed from time to time on the Permitted Concept; (ii) Lessee's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief under the Code for Lessee; and (iii) all defaults under this Lease being cured promptly and this Lease being assumed within 60 days of any order for relief entered under the Code for Lessee, or this Lease being rejected within such 60 day period and the Premises surrendered to Lessor.  Accordingly, in consideration of the mutual covenants contained in this Lease and for other good and valuable consideration, Lessee agrees that:

(i)     All obligations that accrue or become due under this Lease (including the obligation to pay rent), from and after the date that an Action is commenced shall be timely performed exactly as provided in this Lease and any failure to so perform shall be harmful and prejudicial to Lessor;

19

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

(ii)     Any and all obligations under this Lease that accrue or become due from and after the date that an Action is commenced and that are not paid as required by this Lease shall, in the amount of such rents, constitute administrative expense claims allowable under the Code with priority of payment at least equal to that of any other actual and necessary expenses incurred after the commencement of the Action;

(iii)     Any extension of the time period within which Lessee may assume or reject this Lease without an obligation to cause all obligations accruing or coming due under this Lease from and after the date that an Action is commenced to be performed as and when required under this Lease shall be harmful and prejudicial to Lessor;

(iv)     Any time period designated as the period within which Lessee must cure all defaults and compensate Lessor for all pecuniary losses that extend beyond the date of assumption of this Lease shall be harmful and prejudicial to Lessor;

(v)     Any assignment of this Lease must result in all terms and conditions of this Lease being assumed by the assignee without alteration or amendment, and any assignment which results in an amendment or alteration of the terms and conditions of this Lease without the express written consent of Lessor shall be harmful and prejudicial to Lessor;

(vi)     Any proposed assignment of this Lease to an assignee: (A) that will not use the Premises specifically as a Permitted Concept, (B) that does not possess financial condition, operating performance and experience characteristics equal to or better than the financial condition, operating performance and experience of Lessee as of the Effective Date, or (C) that does not provide guarantors of this Lease obligations with financial condition equal to or better than the financial condition of the original guarantors of this Lease as of the Effective Date, if any, shall be harmful and prejudicial to Lessor; and

(vii)     The rejection (or deemed rejection) of this Lease for any reason whatsoever shall constitute cause for immediate relief from the automatic stay provisions of the Code, and Lessee stipulates that such automatic stay shall be lifted immediately and possession of the Premises will be delivered to Lessor immediately without the necessity of any further action by Lessor.

(b)     No Waiver by Lessor.  No provision of this Lease shall be deemed a waiver of Lessor's rights or remedies under the Code or applicable law to oppose any assumption or assignment of this Lease, to require timely performance of Lessee's obligations under this Lease, or to regain possession of the Premises as a result of the failure of Lessee to comply with the terms and conditions of this Lease or the Code.

(c)     Rent under the Code.  Notwithstanding anything in this Lease to the contrary, all amounts payable by Lessee to or on behalf of Lessor under this Lease, whether or not expressly denominated as such, shall constitute "**rent**" for the purposes of the Code.

(d)     Lessee's Successors in Bankruptcy.  For purposes of this Section addressing the rights and obligations of Lessor and Lessee in the event that an Action is commenced, the term "Lessee" shall include Lessee's successor in bankruptcy, whether a trustee, Lessee as debtor in possession or other responsible person.

## ARTICLE 11
## MORTGAGES

11.1     No Liens.  Lessor's interest in this Lease or the Premises shall not be subordinate to any encumbrances placed upon the Premises by or resulting from any act of Lessee, and nothing in this Lease contained shall be construed to require such subordination by Lessor.  EXCEPT AS OTHERWISE CONSENTED TO BY LESSOR PURSUANT TO **SECTION 13.2**, NOTICE IS GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PREMISES OR LESSEE'S LEASEHOLD INTEREST IN THE PREMISES, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID. FURTHERMORE, ANY SUCH PURPORTED TRANSACTION SHALL BE DEEMED A TORTIOUS INTERFERENCE WITH LESSOR'S RELATIONSHIP WITH LESSEE AND LESSOR'S FEE OWNERSHIP OF THE PREMISES.

11.2     Subordinate.  This Lease at all times shall automatically be subordinate to the lien of any and all ground leases and Mortgages now or after the Effective Date placed upon the Premises by Lessor, and Lessee covenants and agrees to execute and

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases and Mortgages as shall be desired by Lessor, or any present or proposed mortgagees or trustees under trust deeds, upon the condition that Lessee shall have the right to remain in possession of the Premises under the terms of this Lease, notwithstanding any default in any or all such ground leases or Mortgages, or after foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing.  Lessor agrees to use its best efforts to provide Lessee with a subordination, nondisturbance and attornment agreement ("**SNDA**") executed by each Lender holding a Mortgage, and Lessee agrees to promptly execute and return such SNDA to Lessor.

      11.3    <u>Election to Declare Lease Superior</u>.  If any mortgagee, trustee, receiver or other secured party elects to have this Lease and the interest of Lessee under this Lease be superior to any Mortgage and evidences such election by notice given to Lessee, then this Lease and the interest of Lessee under this Lease shall be deemed superior to such Mortgage, whether this Lease was executed before or after such Mortgage and in that event such mortgagee, trustee, receiver or other secured party shall have the same rights with respect to this Lease as if it had been executed and delivered prior to the execution and delivery of such Mortgage and has been assigned to such mortgagee, trustee or other secured party.

      11.4    <u>Attornment</u>. In the event any purchaser or assignee of any Lender at a judicial or nonjudicial foreclosure sale acquires title to the Premises, or in the event any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to such Lender or such purchaser or assignee, as the case may be (a "**Successor Lessor**"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Section, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of the lessor under this Lease which accrue after the date that such Successor Lessor acquires title.  The foregoing provision shall be self operative and effective without the execution of any further instruments.

      11.5    <u>Execution of Additional Instruments</u>. Although the foregoing provisions shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver whatever instruments may be reasonably required for such purposes.

      11.6    <u>Notice to Lender</u>. Lessee shall give written notice to any Lender having a recorded lien upon any of the Premises or any part of the Premises which Lessee has been notified of any breach or default by Lessor of any of its obligations under this Lease simultaneously with the giving of such notice to Lessor, and Lessee shall give such Lender at least 60 days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect to such default.

## ARTICLE 12
## ESTOPPEL CERTIFICATES

      12.1.    <u>Lessee Estoppel Certificate</u>.  At any time, and from time to time, Lessee shall, promptly and in no event later than 15 days after a request from Lessor or Lender, execute, acknowledge and deliver to Lessor or Lender a certificate in the form supplied by Lessor, Lender or any present or proposed mortgagee or purchaser designated by Lessor, certifying: (a) that Lessee has accepted the Premises (or, if Lessee has not done so, that Lessee has not accepted the Premises, and specifying the reasons for not accepting the Premises); (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons why this Lease is not in full force and effect; (c) the commencement and expiration dates of the Lease Term, including the terms of any extension options of Lessee; (d) the date to which the rentals have been paid under this Lease and the amount then payable; (e) whether there are then any existing defaults by Lessor in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent of such defaults; (f) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate, and that Lessee is in compliance in all material respect with all of its obligations under this Lease; (g) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of Lessee; (h) that neither Lessor nor Lender has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operations of the Premises; and (i) any other information reasonably requested by Lessor, Lender or such present or proposed mortgagee or purchaser.

      12.2    <u>Lessor Estoppel Certificate</u>.  At any time, and from time to time, Lessor shall, promptly and in no event later than 15 days after a request from Lessee, execute, acknowledge and deliver to Lessee a certificate in the form supplied by Lessee certifying: (a) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons why this Lease is not in full force and effect; (b) the commencement and expiration dates of the Lease Term, including the terms of any extension options of Lessee; (c)

4833-5207-4242.4

the date to which the rentals have been paid under this Lease and the amount then payable; (d) whether Lessor has any actual knowledge of any existing defaults by Lessee in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent of such defaults; (e) that no notice has been given to Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (f) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of Lessor; and (g) any other information reasonably requested by Lessee.

## ARTICLE 13
## ASSIGNMENTS AND SUBLEASES

13.1     <u>Assignment by Lessor</u>.  Lessor shall have the right to sell or convey the Premises subject to this Lease or to assign its right, title and interest as Lessor under this Lease in whole or in part.  In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee and Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained in this Lease, except for obligations or liabilities accrued prior to such assignment or sale.

13.2     <u>Assignment by Lessee; Subletting; Lessee Encumbrances.</u>  Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Premises in entering into this Lease.  Without the prior written consent of Lessor: (a) Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest in this Lease, whether by operation of law or otherwise; (b) no Change of Control shall occur; (c) no interest in any of the Lessee Parties shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of any of the Lessee Parties, and (d) Lessee shall not sublet all or any part of the Premises (each of **items (a)** through **(d)** are referred to in this Lease as a "**Prohibited Transaction**").  In addition, no interest in any of the Lessee Parties, or in any individual or person owning directly or indirectly any interest in any of the Lessee Parties, shall be transferred, assigned or conveyed to any individual or person whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or who is in violation of any of the OFAC Laws and Regulations, and any such transfer, assignment or conveyance shall not be effective until the transferee has provided written certification to Lessor that (x) the transferee or any person who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations, and (y) the transferee has taken reasonable measures to assure than any individual or entity who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations.

13.3     <u>Lessor's Consent</u>.  Lessor's consent to a Prohibited Transaction shall be subject to the satisfaction of such conditions as Lessor shall determine in its sole discretion, including, without limitation, (a) Lessee having executed and delivered such modifications to the terms of this Lease as Lessor shall reasonably request, (b) the proposed transferee, as applicable, having assumed this Lease, (c) payment to Lessor of any rentals owing under a sublease which are in excess of any rentals owing under this Lease, and (d) the proposed transferee having satisfactory creditworthiness and satisfactory experience operating a Permitted Concept.  In addition, any such consent shall be conditioned upon the payment by Lessee to Lessor of (x) a reasonable processing and review fee, and (y) all out-of-pocket costs and expenses incurred by Lessor in connection with such consent, including, without limitation, reasonable attorneys' fees.

13.4     <u>Applicability</u>.  The provisions of this **Article 13** shall apply to every Prohibited Transaction regardless of whether voluntary or not, or whether or not Lessor has consented to any previous Prohibited Transaction.  No assignment of this Lease or subletting of the Premises shall relieve Lessee of its obligations under this Lease or any Guarantor of this Lease of any of its obligations under its Guaranty.  Any Prohibited Transaction in violation of this **Article 13** shall be voidable at the sole option of Lessor.

## ARTICLE 14
## MEMORANDUM OF LEASE

14.1     <u>Memorandum of Lease</u>.  Concurrently with the execution of this Lease, Lessor and Lessee are executing a memorandum or short form of this Lease (the "**Memorandum of Lease**") to be recorded in the applicable real property records for each county in which each portion of the Premises is located.  The Memorandum of Lease will contain exhibits with the addresses and store identification numbers for the Premises and the applicable legal description for each portion of the Premises located in that county.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease or quit claim deed in recordable form to be held by Lessor in trust until the expiration or sooner termination of the Lease Term.

22

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

**ARTICLE 15**
**GENERAL PROVISIONS**

15.1    Force Majeure.  Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, except the obligations imposed with regard to Rent to be paid by Lessee pursuant to this Lease and any indemnification obligations imposed upon Lessee under this Lease.

15.2    Administrative Processing and Review.  If Lessee makes any request upon Lessor requiring Lessor or the attorneys of Lessor to (a) review or prepare (or cause to be reviewed or prepared) any documents, plans, specifications or other submissions in connection with or arising out of this Lease, (b) consent to any request of Lessee, or (c) waive or amend any provision of this Lease, then Lessee shall (i) reimburse Lessor upon demand for all out-of-pocket costs and expenses incurred by Lessor in connection with such review or preparation, including, without limitation, reasonable attorneys' fees, and (ii) pay Lessor a reasonable processing and review fee.

15.3    Notices.  All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Lease shall be in writing and given by (a) hand delivery, (b) facsimile, (c) express overnight delivery service or (d) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (w) receipt, if hand delivered, (x) transmission, if delivered by facsimile, (y) the next Business Day, if delivered by express overnight delivery service, or (z) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested.  Notices shall be provided to the parties and addresses (or facsimile numbers, as applicable) specified in the Basic Lease Information above, or to such other address or such other person as either party may from time to time after the Effective Date specify to the other party in a notice delivered in the manner provided above.

15.4    Time of Essence; Time Periods.  Time is of the essence of this Lease.  The time for performance of any obligation or taking any action under this Lease shall be deemed to expire at 5:00 P.M. Phoenix, Arizona time on the last day of the applicable time period provided for in this Lease.  If the time for the performance of any obligation or taking any action under this Lease expires on a day other than a Business Day, the time for performance or taking such action shall be extended to the next succeeding Business Day.

15.5    Consent of Lessor.  Unless specified otherwise in this Lease, Lessor's consent to any request of Lessee may be conditioned or withheld in Lessor's sole discretion.  Lessor shall have no liability for damages resulting from Lessor's failure to give any consent, approval or instruction reserved to Lessor, Lessee's sole remedy in any such event being an action for injunctive relief.  It is understood and agreed that to the extent Lessor is required to obtain the consent, approval, agreement or waiver of Lender with respect to a matter for which Lessor's approval has been requested under this Lease, Lessor shall in no event be deemed to have unreasonably withheld such approval if Lender shall not have given its consent, approval, agreement or waiver if required.

15.6    Waiver and Amendment.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Base Monthly Rent and Additional Rent stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Base Monthly Rent or Additional Rent then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

15.7    Successors Bound.  Except as otherwise specifically provided in this Lease, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties to this Lease.

15.8    No Merger.  The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation of this Lease, shall not result in a merger of Lessor's and Lessee's estates, and shall, at the option of Lessor, either terminate any or all existing subleases or subtenancies, or operate as an assignment to Lessor of any or all of such subleases or subtenancies.

15.9    Interpretive Provisions.  Unless the context of this Lease clearly requires otherwise or unless otherwise expressly stated in this Lease, this Lease shall be construed in accordance with the following:

(a)    Use of Certain Words.  References to the plural include the singular and to the singular include the plural and references to any gender include any other gender.  The part includes the whole; the terms "include" and

23

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

"including" are not limiting; and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Lease refer to this Lease as a whole and not to any particular provision of this Lease.

(b)     References. References in this Lease to "Sections," "Exhibits," or "Schedules" are to the Sections of this Lease and the Exhibits and Schedules to this Lease. Any reference to this Lease includes any and all amendments, extensions, modifications, renewals, or supplements to this Lease. The headings of this Lease are for purposes of reference only and shall not limit or define the meaning of any provision of this Lease.

(c)     Construing the Lease. Each of the parties to this Lease acknowledges that such party has had the benefit of independent counsel with regard to this Lease and that this Lease has been prepared as a result of the joint efforts of all parties and their respective counsel. Accordingly, all parties agree that the provisions of this Lease shall not be construed or interpreted for or against any party to this Lease based upon authorship or any other factor but shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties to this Lease.

(d)     Partial Invalidity. If any portion of this Lease is determined to be unconstitutional, unenforceable or invalid, such portion of this Lease shall be stricken from and construed for all purposes not to constitute a part of this Lease, and the remaining portion of this Lease shall remain in full force and effect and shall, for all purposes, constitute the entire Lease.

15.10     Characterization. Subject to Section 15.20, it is the intent of the parties to this Lease that the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between landlord and tenant and has been entered into by both parties in reliance upon the economic and legal bargains contained in this Lease. None of the agreements contained in this Lease, is intended, nor shall the same be deemed or construed, to create a partnership between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

15.11     No Offer. No contractual or other rights shall exist between Lessor and Lessee with respect to the Premises until both have executed and delivered this Lease, notwithstanding that deposits may have been received by Lessor and notwithstanding that Lessor may have delivered to Lessee an unexecuted copy of this Lease. The submission of this Lease to Lessee shall be for examination purposes only, and does not and shall not constitute a reservation of or an option for Lessee to lease or otherwise create any interest on the part of Lessee in the Premises.

15.12     Other Documents. Each of the parties agrees to do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, documents and assurances as may be reasonably required or deemed advisable to carry into effect the purposes of this Lease, to perfect any lien or security interest granted in this Lease and for the better assuring and confirming of all of Lessor's rights, powers and remedies under this Lease.

15.13     Attorneys' Fees. In the event of any judicial or other adversarial proceeding between the parties concerning this Lease, to the extent permitted by law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other costs in addition to any other relief to which it may be entitled. In addition, Lessor shall, upon demand, be entitled to all attorneys' fees and all other costs incurred in the preparation and service of any notice or demand under this Lease, whether or not a legal action is subsequently commenced. Without limiting the foregoing or any other provision of this Lease, Lessor and Lessee hereby agree that in accordance with O.C.G.A. § 13-1-11, if any rental or other money obligation owing under this Lease is collected by or through an attorney at law, Lessee agrees to pay fifteen percent (15%) thereof as attorneys' fees.

15.14     Entire Lease. This Lease, including all exhibits and schedules attached to this Lease, constitutes the entire Lease between the parties pertaining to the subject matter contained in this Lease. All prior and contemporaneous leases, representations and understandings of the parties, oral or written, are superseded by and merged in this Lease.

15.15     Forum Selection; Jurisdiction; Venue; Choice of Law. Lessee acknowledges that this Lease was substantially negotiated in the State of Arizona, the executed Lease was delivered in the State of Arizona, all payments under this Lease will be delivered in the State of Arizona (unless otherwise directed by Lessor or its successors) and there are substantial contacts between the parties and the transactions contemplated in this Lease and the State of Arizona. For purposes of any action or proceeding arising out of this Lease, the parties to this Lease expressly submit to the jurisdiction of all federal and state courts located in the State of Arizona. Lessee and Lessor consent that they may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law. Furthermore, Lessee and Lessor

24

waive and agree not to assert in any such action, suit or proceeding that they are not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. The creation of this Lease and the rights and remedies of Lessor with respect to the Premises, as provided in this Lease and by the laws of the state in which the Premises is located, as applicable, shall be governed by and construed in accordance with the internal laws of the state in which the Premises is located, as applicable, without regard to principles of conflicts of law. With respect to other provisions of this Lease, this Lease shall be governed by the internal laws of the State of Arizona, without regard to its principles of conflicts of law. Nothing contained in this Section shall limit or restrict the right of Lessor or Lessee to commence any proceeding in the federal or state courts located in the state in which the Premises is located to the extent Lessor or Lessee deems such proceeding necessary or advisable to exercise remedies available under this Lease.

15.16   Counterparts. This Lease may be executed in one or more counterparts, each of which shall be deemed an original.

15.17   Joint and Several Liability. If Lessee consists of more than one individual or entity, each such individual or entity shall be jointly and severally liable for all obligations of Lessee under this Lease.

15.18   No Brokerage. Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Premises. Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, for, from and against any and all liabilities, claims, losses, costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

15.19   Waiver of Jury Trial and Punitive, Consequential, Special and Indirect Damages. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSOR AND LESSEE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES TO THIS LEASE AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF ANY OF THE PREMISES, OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES TO THIS LEASE OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, LESSEE AND LESSOR KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER AND ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER OR ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED IN THIS LEASE OR RELATED TO THIS LEASE. THE WAIVER BY LESSEE AND LESSOR OF ANY RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES TO THIS LEASE AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

15.20   Usufruct. Lessee has only a usufruct under this Lease, not subject to levy and sale. No estate is conveyed by this Lease.

**ARTICLE 16**
**RIGHT OF FIRST OFFER**

16.1.   Right of First Offer. If, at any time after the first anniversary of the Effective Date during the Lease Term, Lessor desires to sell its interest in the Premises to a third party then, provided that no Unmatured Default or Event of Default has occurred and is continuing, Lessor shall give Lessee the right to purchase such interest (the "**Interest**") for a price and on terms and conditions, determined by Lessor and set forth in a notice (the "**ROFO Notice**") given to Lessee. Lessee shall have 15 calendar days to elect in writing to acquire such Interest at such price and on such terms and conditions. Lessee's silence shall be deemed a waiver of its right to acquire such Interest. Any such election by Lessee shall only be effective if accompanied by Lessee's payment to Lessor of a cash down payment equal to 10% of such price. If Lessee timely and properly elects to acquire such Interest, the closing shall take place within 60 days after the ROFO Notice is given to Lessee. The balance of the purchase price shall be paid in cash at closing. If Lessee does not timely elect to acquire such Interest, Lessor shall be free to sell the Interest to any other Person within 12 months of Lessee's rejection or deemed rejection without being required to comply again with the foregoing provisions of this Section, provided that, if Lessor intends to sell the Interest (i) after such 12 month period or

25

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

(ii) within such 12 month period at a price less than 90% of the price described in the ROFO Notice or on economic terms more favorable to a purchaser than those set forth in the ROFO Notice, Lessor shall give Lessee written notice, setting forth the applicable purchase price and terms and conditions, and Lessee shall have 15 calendar days to elect in writing to purchase the Interest at such purchase price and on such terms and conditions. The right of first offer granted by this Section shall not survive the expiration or earlier termination of this Lease or, subject to the preceding sentence, the purchase of the Premises by a third party after Lessee's failure to exercise such right or Lessee's waiver of such right. Furthermore, the right of first offer granted by this Section shall not apply to a foreclosure of any of the Mortgages or the delivery to Lender of a deed-in-lieu of foreclosure and shall not survive any such foreclosure or delivery of a deed-in-lieu of foreclosure. Upon the termination of this right of first offer, Lessee shall execute such instruments as may be reasonably required by Lessor to provide constructive notice of the termination of such right.

## ARTICLE 17
## SECURITIZATION

17.1     Defined Terms. For purposes of this **Article 17**, the following defined terms have the following meanings:

"*Loan Pool*" means: (i) in the context of a Securitization, any pool or group of loans that are a part of such Securitization; (ii) in the context of a Transfer, all loans which are sold, transferred or assigned to the same transferee; and (iii) in the context of a Participation, all loans as to which participating interests are granted to the same participant.

"*Participation*" means one or more grants by Lender or any Affiliate of Lender to a third party of a participating interest in notes evidencing obligations to repay secured or unsecured loans owned by Lender or any Affiliate of Lender or any or all servicing rights with respect to such loans.

"*Securitization*" means one or more sales, dispositions, transfers or assignments by Lender or any Affiliate of Lender to a special purpose corporation, trust or other entity identified by Lender or any Affiliate of Lender of notes evidencing obligations to repay secured or unsecured loans owned by Lender or any Affiliate of Lender (and, to the extent applicable, the subsequent sale, transfer or assignment of such notes to another special purpose corporation, trust or other entity identified by Lender or any Affiliate of Lender), and the issuance of bonds, certificates, notes or other instruments evidencing interests in pools of such loans, whether in connection with a permanent asset securitization or a sale of loans in anticipation of a permanent asset securitization. Each Securitization shall be undertaken in accordance with all requirements which may be imposed by the investors or the rating agencies involved in each such sale, disposition, transfer or assignment or which may be imposed by applicable securities, tax or other laws or regulations.

"*Transfer*" means one or more sales, transfers or assignments by Lender or any Affiliate of Lender to a third party of notes evidencing obligations to repay secured or unsecured loans owned by Lender or any Affiliate of Lender or any or all servicing rights with respect to such loans.

17.2     Transfer, Participation or Securitization Covenants. Lessee agrees to cooperate in good faith with Lessor, and the holder of any security interest in the Premises, in connection with any sale or transfer of the Premises by Lessor or any transfer, participation, syndication or securitization of any security interest in the Premises, or any or all servicing rights with respect to the Premises, including, without limitation, (i) providing such documents, financial and other data, and other information and materials (the "**Disclosures**") which would typically be required with respect to the Lessee Parties by a purchaser of the Premises or a purchaser, transferee, assignee, servicer, participant, co-lender, investor or rating agency involved with respect to any transfer, participation, syndication or securitization of any security interest in the Premises, as applicable; *provided, however*, the Lessee Parties shall not be required to make Disclosures of any confidential information or any information which has not previously been made public unless required by applicable federal or state securities laws; and (ii) amending the terms of this Lease to the extent necessary so as to satisfy the requirements of purchasers, transferees, assignees, servicers, participants, co-lenders, investors or selected rating agencies involved in any such transfer, participation, syndication or securitization, so long as such amendments would not have a material adverse effect upon the Lessee Parties or the transactions contemplated by this Lease. Lessor shall be responsible for causing the lender undertaking any of the transactions contemplated by this **Article 17** to prepare at no expense to Lessee any documents evidencing the amendments referred to in the preceding subitem (ii). Lessee consents to Lessor and such holder providing the Disclosures, as well as any other information which Lessor and such holder may now have or after the Effective Date acquire with respect to the Premises or the financial condition of the Lessee Parties to each prospective purchaser of the Premises as well as each prospective purchaser, transferee, assignee, servicer, participant, co-lender, investor or rating agency involved with respect to any such transfer, participation, syndication or securitization of any security interest in the Premises, as applicable. Lessee shall pay its own attorney fees and other out-of-pocket expenses incurred in connection with the performance of its obligations under this **Article 17**.

26

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

**EXECUTED** as of the date written on the first page of this Lease.

Signed, sealed and delivered
In presence of:

_____
Unofficial witness

*Karen A. Beauchemin*
Notary Public
MY COMMISSION EXPIRES:
*Aug 13, 2009*

(AFFIX NOTARY SEAL)

**LESSOR**:

**GE CAPITAL FRANCHISE FINANCE CORPORATION,**
Delaware corporation

By *Barbara Adam*
Printed Name *Barbara Adam*
Its Authorized Signatory

Signed, sealed and delivered
In presence of:

_____
Unofficial witness

Notary Public
MY COMMISSION EXPIRES:

(AFFIX NOTARY SEAL)

**LESSEE**:

**GK MANAGEMENT, INC.,**  a Georgia corporation

By _____
Printed Name _____
Its Authorized Signatory

27

4833-5207-4242.4

**EXECUTED** as of the date written on the first page of this Lease.

Signed, sealed and delivered
In presence of:

**LESSOR**:

**GE CAPITAL FRANCHISE FINANCE CORPORATION**,
Delaware corporation

_____
Unofficial witness

By _____
Printed Name _____
Its Authorized Signatory

Notary Public
MY COMMISSION EXPIRES:

(AFFIX NOTARY SEAL)


Signed, sealed and delivered
In presence of:

**LESSEE**:

**GK MANAGEMENT, INC.**,  a Georgia corporation

Unofficial witness

By _____
Printed Name _____
Its Authorized Signatory

Notary Public
MY COMMISSION EXPIRES: 2-21-11

(AFFIX NOTARY SEAL)

27

**EXHIBIT A**

**PREMISES**

| Unit Number | GECC Asset Number | Address |
|:---:|:---:|:---:|
| 16259 | 031025 | 2000 Watson Blvd, Warner Robins, GA 31093 |
| 10825 | 031054 | 2617 Deans Bridge Rd, Augusta, GA 30906 |

28

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08

## EXHIBIT A-1

### LEGAL DESCRIPTIONS

### Warner Robins, GA

All that tract of parcel of land situate, lying and being in Land Lot 165 of the 5th Land District of Houston County, Georgia, being more particularly described as follows:

BEGIN at a rebar marking the intersection of the northerly right-of-way line of Watson Boulevard (100 foot right-of-way) with the westerly right-of-way line of Woodcrest Boulevard (80 foot right-of-way); thence North 88°31'15" West along said northerly right-of-way line of Watson Boulevard a distance of 115.26 feet to a rebar; thence North 00°00'34" West a distance of 209.92 feet to a rebar; thence South 88°33'54" East a distance of 115.10 feet to a rebar on said westerly right-of-way line of Woodcrest Boulevard; thence South 00°03'06" East along said right-of-way line a distance of 210.01 feet to the POINT OF BEGINNING.

### Augusta, GA

All that tract or parcel of land located in the State of Georgia, County of Richmond, being more particularly described as follows:

Commence at the intersection of the southwesterly right-of-way line of Murphy Road (40 foot right-of-way) with the Northwesterly right-of-way line of Deans Bridge Road (85 foot right-of-way); thence South 55°04'48" West along said northwesterly right-of-way line of Deans Bridge Road a distance of 550.29 feet to a concrete monument; thence continue South 55°04'48" West along said right-of-way line a distance of 173.71 feet to a rebar marking the POINT OF BEGINNING of the following described parcel; thence South 55°45'01" West along said right-of-way line a distance of 130.10 feet to an "X" in sidewalk; thence North 36°10'01" West a distance of 224.89 feet to a rebar; thence North 55°43'33" East a distance of 130.07 feet to a rebar; thence South 36°10'25" East a distance of 224.99 feet to the POINT OF BEGINNING.

29

Contract No. 15089005
Asset Nos. 031025, et al.
4/7/08